**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-1627

JOANNA JOHNSON,

         Plaintiff,

v.

THOMPSON R2-J SCHOOL DISTRICT,

         Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

## INTRODUCTION

1.    This action is brought by the Plaintiff, Joanna Johnson, the Mother of a student at Loveland High School. The Plaintiff is permanently physically disabled and is an ambulatory wheelchair user who regularly uses other mobility aids depending on the status of her dynamic disabilities. Plaintiff transports her mobility aids in her automobile which displays a Persons With Disabilities Parking Placard.

2.    Plaintiff brings this action for declaratory and injunctive relief against Defendant Thompson R2-J School District for illegally discriminating against her in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12131 *et seq*., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"). Thompson R2-J School District has developed, maintained, and enforced building access policies for the Loveland

1

High School building in Loveland, Colorado, that have effectively prevented the Plaintiff from having equal access to government services supplied by the school.

3.  Plaintiff's multiple and serious neurological and autoimmune disorders, as well as lung disease, cause her considerable pain and impair her ability to walk. The State of Colorado has determined her to have a disability entitling her to a Persons With Disabilities Parking Placard.

4.  As a consequence of these conditions, which substantially limit her major life activities of walking and talking, Plaintiff also has a disability as that term is defined by the ADA and Section 504 and qualify her as a disabled person under 42 U.S.C. § 12102(2).

5.  On multiple occasions, as further delineated below, Plaintiff arrived at the Loveland High School building to attend numerous functions such as Parent/Teacher Conferences, Music Concerts, and other activities in which parents normally participate. Between October 6, 2023 and the date of this filing, Plaintiff was denied access to the school on more than twenty two (22) separate occasions. Between October 10, 2023 and the date of this filing, Plaintiff was denied independent access on approximately thirteen separate occasions and was only able to access the building with the assistance of friends, family members, and strangers.

6.  The main parking lot of Loveland High School is not ADA compliant due to slope.

7.  Instead of addressing the slope issue, Defendant told Plaintiff to park in handicapped parking spaces in the southern swim lot.

8.  The path from the southern swim lot to the main entrance was not accessible.

9.  Upon complaint by Plaintiff, Plaintiff was told to use the entrance at the swim lot.

10. Plaintiff made a Complaint to Defendant's Human Resources department.

11.   Upon complaint that the swim lot door was locked, a push-plate and video call button was installed.

12.   Human Resources found that the push-plate and video call button resolved the issues raised by Plaintiff's Complaint.

13.   Plaintiff disagreed and appealed the decision, where she notified the Defendant that the push buttons on the exterior and interior of the door did not work and the video call button was unmanned. Plaintiff also notified Defendant of the inaccessible route from the swim entrance to the auditorium and blocked seating in the auditorium.

14.   The result of the appeal was that Plaintiff was told to arrange ahead of time for access to and from the building with a badged employee escort. There was no accommodation expressly offered for the inaccessibility of the hallway or auditorium.

15.   As a consequence of their discriminatory actions, Defendant has effectively barred Plaintiff, from her son's enrollment in fall of 2023 to present, from equal access to any public meeting or forum held at Loveland High School. As a direct and proximate result of Defendants' intentional actions, Plaintiff has suffered emotional distress, humiliation, and embarrassment.

## JURISDICTION

16.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331-1345 because it involves claims arising under federal law. The action is authorized pursuant to Title II of the ADA, 42 U.S.C. §§12131 *et seq*., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

17. Venue is proper in this district pursuant to 28 U.S.C. §1392 because a substantial part of the acts and omissions giving rise to this action occurred in the District of Colorado. 28 U.S.C. §1392(b).

## PARTIES

### *Plaintiff Joanna Johnson*

18. Joanna Johnson and her child are residents of Loveland, Colorado.

19. Plaintiff is Joanna Johnson, a qualified individual with a disability as that term is defined by the ADA, 42 U.S.C. §12102, and Section 504, 29 U.S.C. §705(2), as she has a physical impairment that substantially limits her major life activities of walking, breathing, working, sleeping, and concentration.

20. Plaintiff's address is within Thompson R2-J School District.

21. From the 1960s until approximately 2019, Plaintiff's address was within the Loveland High School boundary lines. Because LHS is the closest high school to Plaintiff's address and because of LHS' music programs, Plaintiff's son "choices" in to LHS with the approval of the school's principal.

22. Plaintiff is the mother of a child who was a freshman at Loveland High School in the 2023-2024 school year.

### *Defendant Thompson R2-J School District*

23. Defendant is Thompson R2-J School District ("School District"), headquartered at 800 S. Taft Ave, Loveland, CO 80537.  School District is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. §§12131-34, and its implementing regulation, 29 C.F.R. Part 35. The School District is also amenable to suit under section 504 as the recipient of federal financial assistance.

24. A "public entity" includes any state or local government, as well as any department, agency, or other instrumentality of a state or local government, and it applies to all services, programs, and activities provided or made available by public entities, such as through contractual, licensing, or other arrangements. Id. §12131(1); 28 C.F.R. §35.130(b)(3)(i).

25. Defendant School District built and owns the Loveland High School building, where Plaintiff was subjected to discrimination, denied effective access, and denied reasonable accommodations for her disability.

26. At all times discussed herein, Defendant School District employed John Sinnett under the title "Bond Project Manager".

27. At all times discussed herein, Defendant School District employed Tammie Knauer under the title "Bond Director".

28. At all times discussed herein, Defendant School District employed Kristin Battige under the title "Director of Operations".

29. At all times discussed herein, Defendant School District employed Bill Siebers under the title "Chief Human Resources Officer".

30. At all times discussed herein, Defendant School District employed Melissa Schneider under the title "Chief Academic Officer".

31. At all times discussed herein, Defendant School District employed Marc Schaffer under the title "Superintendent of Schools".

32. At all times discussed herein, Defendant School District employed Todd Piccone under the title "Chief Operations Officer".

33. At all times discussed herein, Defendant's employees acted as its agents.

34.   At no time discussed herein was an ADA coordinator employed by the Defendant. This omission is in violation of 28 C.F.R. § 35.107(a) which states "a public entity that employs 50 or more persons shall designate at least one ADA coordinator to ensure its ADA responsibilities are carried out, and to investigate ADA complaints; the name, address, and phone number must be public."

## STATEMENT OF FACTS

35.   Plaintiff has been diagnosed with Sjogren's syndrome. Secondary to Sjogren's syndrome, she suffers from dysautonomia, erythromelalgia, small fiber neuropathy, bronchiolitis, neurogenic orthostatic hypotension, vitiligo, mast cell activation syndrome, greater trochanteric bursitis, fibromyalgia, neurocardiogenic presyncope, hearing loss, plantar plate injury, de Quervain tenosynovitis, and peripheral neuropathy.

36.   Sjogren's syndrome is a systemic disorder of the immune system. While initially presenting with dryness in the eyes and mouth, it may progress to extra-glandular involvement in organs such as the joints, skin, lungs, gastrointestinal (GI) tract, nervous system, and kidneys. [1]

37.   Plaintiff's symptoms include severe pain in her feet, hips, hands, and wrists along with orthostatic hypotension, difficulty breathing, and gastrointestinal distress which impair her functional mobility.

38.   Plaintiff's symptoms require the use of a variety of mobility devices such as a knee scooter, walking canes, and wheelchair.

## STATUTORY AND REGULATORY BACKGROUND

***Americans with Disabilities Act***

---

[1] Carsons SE, Patel BC. Sjogren Syndrome. [Updated 2023 Jul 31]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2024 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK431049/

39. Congress enacted the Americans with Disabilities Act ("ADA") in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1).

40. Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem" *Id.* §12101(a)(2).

41. As such, Congress mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity". *Id.* §12132.

42. A "public entity" includes any state or local government, as well as any department, agency, or other instrumentality of a state or local government, and it applies to all services, programs, and activities provided or made available by public entities, such as through contractual, licensing, or other arrangements. *Id.* §12131(1); 28 C.F.R. §35.130(b)(3)(i).

### *Rehabilitation Act*

43. Congress enacted the Rehabilitation Act ("Rehabilitation Act" or "Section 504") in 1973 with "the goal of providing individuals with disabilities with the tools necessary to make informed choices and decisions and achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals". 29 U.S.C. §701 (a)(6).

44. The Rehabilitation Act reflected the policy of the United States "that all programs, projects, and activities receiving assistance under this Act shall be carried out in a manner consistent

with the principles of… respect for the privacy, rights, and equal access (including the use of accessible formats), of the individuals…[and] inclusion, integration, and full participation of the individuals." 29 U.S.C. §701(c).

### Regulatory Background

45. The Office for Civil Rights ("OCR") is a subdivision of the Department of Education with a Denver Office.

46. The OCR states that their mission "is to ensure equal access to education and promote educational excellence throughout the nation through vigorous enforcement of civil rights".[2]

47. OCR states it "enforces Title II of the Americans with Disabilities Act of 1990, which prohibits discrimination based on disability by public entities, regardless of whether they receive federal assistance".[3]

48. Under the ADA and Section 504 of the Rehabilitation Act of 1973 and their regulations, "OCR has jurisdiction over public schools and districts".[4]

49. In Colorado, an OCR Complaint often results in the party charged with non-compliance being placed on a Voluntary Compliance Plan.

50. OCR conducts an evaluation of the complaint, determines whether it can investigate the complaint, and then opens valid complaints for investigation.

51. "If OCR determines that a recipient failed to comply with the civil rights law(s) that OCR enforces, OCR will contact the recipient and will attempt to secure the recipient's willingness to negotiate and sign a written resolution agreement that describes the specific

---

[2] "Office of Civil Rights" Federal Civil Rights Handouts. Colorado Department of Education. https://www.cde.state.co.us/spedlaw/sessionc2_2022. Last accessed May 9, 2024.
[3] "Office of Civil Rights" Federal Civil Rights Handouts. Colorado Department of Education. https://www.cde.state.co.us/spedlaw/sessionc2_2022. Last accessed May 9, 2024.
[4] "Office of Civil Rights" Federal Civil Rights Handouts. Colorado Department of Education. https://www.cde.state.co.us/spedlaw/sessionc2_2022. Last accessed May 9, 2024.

remedial actions that the recipient will undertake to address the area(s) of noncompliance identified by OCR".[5]

52. The written resolution agreement is called a Voluntary Compliance Plan ("VCP").

53. In Colorado, a Compliance Specialist from the Colorado Community College System monitors whether the charged party complies with the VCP.

## FACTUAL BACKGROUND

### Defendant's Voluntary Compliance Plan

54. Upon information and belief, Defendant was on a voluntary compliance plan from OCR for ADA upgrades to Loveland High School in 2014 including bringing the three parking lots into compliance.

55. An OCR spreadsheet dated October 15, 2014 includes LHS ADA upgrades to parking lots along with the plan by the school to voluntarily comply. (Exhibit 1)

56. On or about February 27, 2023, Tammie Knauer, the Defendant's Bond Director, wrote to the FCI Constructors, Inc., and copied MOA Architecture, regarding the "original report summary" and stating that "there are numbers plugged by FCI… Looks like they guessed around $200k. I'll put a budget sheet together to confirm where we are with soft costs/etc… I don't think there are many constraints. The work has to be done so we just need ROM's asap to help drive the budget more. It is General Fund – so we just need to speak up early to grab the funds we need to finish the scope in full." Later in the email chain, Knauer notes "These LHS items MUST be done this summer/by September." (Exhibit 2)

57. On or about March 7, 2023, Becky Giacomelli, a Compliance Specialist from the Colorado Community College System, contacted Danielle Bundy, Kristen Battige, and Jason Arebalos

---

[5] "How the Office for Civil Rights Handles Complaints" Office for Civil Rights. U.S. Department of Education. https://www2.ed.gov/about/offices/list/ocr/complaints-how.html. Last accessed May 9, 2024.

from the Defendant school district as a "follow up … regarding the status of Loveland High School's facilities portion of the Voluntary Compliance Plan". (Exhibit 3)

58. On or about March 31, 2023, FCI Constructors, Inc. did a "job walk" to assess the potential costs of a "full ADA upgrade to the West parking lot".

59. On or about April 3, 2023, a meeting was held between John Sinnett, Tammie Knauer, Kristen Battige and several representatives from MOA Architecture and FCI Constructors for "LHS ADA- Review Final Scope". (Exhibit 4)

60. On or about April 4, 2023, FCI Constructors sent an email to Defendant via John Sinnett, Kristen Battige, and Tammie Knauer containing an estimate where "the intent is to demo and remove the existing asphalt parking lot and replacing it with new 6" concrete paving. We would also demo and remove the curb and gutter with island and replace back to meet ADA standards. We would also restripe and provide new HC parking signage at this location only. The cost includes all associated work plus all markups and necessary fees needed to complete this project". (Exhibit 5)

61. This email stated "The total cost for the complete upgrade is $182,307". (Exhibit 5)

62. Of particular interest, this email also stated "We wanted to provide this to you to give you an idea of the cost impact associated with the ADA upgrade work. Also, hopefully this will help you with your discussions with the State so they can understand the magnitude of cost for this work if it's required with the intent of them allowing TSD to perform the minimal amount of work in lieu of the complete upgrade to help with cost and meeting the budget allocated for the project". (Exhibit 5)

63. As of the date of this email, Defendant was already aware that it was not in compliance with the ADA and the state was already overseeing the ADA accessibility of Loveland High School.

64. On information and belief, given the discussions both prior and subsequent to this meeting, the scope of the renovations at the April 4, 2023 meeting discussed a "striping only plan" to defer the costs associated with addressing the slope and grade issues.

65. On or about April 13, 2023, John Sinnet wrote to Kristen Battige and Tammie Knauer: "I will be sending you a meeting request for you, I, Tammie and Gardner to discuss the design of the ADA parking lot on the 'west' side. Essentially, we cannot design a striping only plan. The design firms JVA and MOA Architecture cannot submit a design (even for a 'reasonable accommodation') that they know is not per code. We need to talk through how to approach this." (Exhibit 6)

66. On or about April 13, 2023, the meeting discussed in the paragraph above was held. (Exhibit 6)

67. On or about April 19, 2023, Tammie Knauer, the Bond Director, wrote to John Sinnet, the Bond Project Manager, referencing the Voluntary Compliance Plan, stating "the document we have reviewed show that we committed to completing by September 1, 2023. I understand there are no exceptions after confirming with Todd multiple times. Starting in January instead of fall didn't help, but those are the restrictions/guidelines we were given and need to target. Please work towards that commitment with strategic implementation of the scope and let's make sure to discuss in depth as the # in the State cue is realized. Meeting with the State and LCHD to convey the project and urgency will be helpful as MOA moves forward too." (Exhibit 7)

68. On or about April 19, 2023, John Sinnet replied to Tammie Knauer that "We have been told that this work needs to be completed in August. We are having concerns we can meet that schedule. Can you share what you know about deadlines? Right now, it looks like we won't get our permit until the third week of August. Obviously, we can't install all this in a week. Is there a deadline for our commitment to OCR that might give us a little more time? Could we ask for an extension of a few more weeks?" (Exhibit 7)

69. On or about April 20, 2023, John Sinnet emailed a "LHS -  SHUT DOWN REQUEST – Site Parking Partial Shut Down/Restrictions- Monday April 24 – AM" stating "for the design of the ADA Improvements we are working on, we need to do some surveying of the existing handicap spots in two of the parking lots. We are requesting to shut down the handicap areas only, leaving the other spaces as open as possible….Someone from FCI will be there to guide users to a handicap spot if anyone requests one…. Please see the below and attached shut down notice and map image for locations. If you are OK with this plan, do nothing." (Exhibit 8). See Figures A and B below.

## SHUT DOWN REQUEST / NOTIFICATION

ISSUED BY/DATE:   John Sinnett - 042023

| Site | Date | Time | Area/Room number | Reference (WN, Punch item, etc.) | Describe work | Any Utilities affected? (on/off, need schedules altered, etc.) | Subcontractors | Contractor | Superintendent /Main GC contact | TSD Project Manager /Main TSD contact |
|------|------|------|------------------|----------------------------------|---------------|-----------------------------------------------------------------|----------------|------------|----------------------------------|---------------------------------------|
| Loveland High School | Monday, April 24, 2023 | 6 AM to Noon | West (Main) Parking Lot and "Swim" Parking Lot HC and ADJACENT STALLS - See attached images | Surveying for Upcoming ADA Project | A survey crew will block off the HC spots to do some surveying of the area. | No.  Parking and Handicap Parking directly affected!  A few spots will be available! | JVA Engineers | FCI Constructors | Mike Menke - FCI - cell phone 970.691.0724 OR  Preston Carpenter - FCI - Cell Phone 720.745.3122 | John Sinnett cell phone: 970.566.2909 |
| | | | | | | | | | | |

*Fig. A- Shut Down Request Notification from Exhibit 8 obtained by Plaintiff in her October 2023 CORA Request.*



*Fig. B.- Shut down locations in blue, building outline in red. From Exhibit 8 obtained by Plaintiff in her October 2023 CORA Request.*

70. On or about April 24, 2023, Gardner Clute at MOA Architecture notified John Sinnett that he had started the permit application for the LHS project.

71. On or about June 1, 2023, John Sinnett, Bond Project Manager, emailed Tammie Knauer, the Bond Director, stating "Gardener called me". "Gardener" is Gardner Clute, an Architecture Associate and Senior Project Manager at MOA Architecture. Sinnett's email continued: "He would like to make a recommendation that we sit down with OCR before doing the work and make sure our project meets the intended goals. Many of the directives in the OCR report are not currently ADA compliant. They have designed the project to

current code standards, and some of the scope differs from what OCR said to do. MOA believes it would behoove the team to ensure we've got this right before we spend the money and then have issues. Gardner is fully aware of the long and challenging history of this project, and he is aware 'we' (TSD) may not want to open up any further discussions with OCR at this point". (Exhibit 9)

72.   On or about June 2, 2023, Tammie Knauer, Bond Director, replied "I think we need to huddle up too. After reviewing the budget with John and Todd yesterday – we have some work to do yet to address the issues and stay within budget". (Exhibit 9)

73.   On or about June 6, 2023, a meeting was held between Tammie Knauer and John Sinnett. (Exhibit 10)

74.   On or about June 12, 2023, a meeting was held between Kristen Battige, John Sinnett, Jackie Allen, and Tammie Knauer. (Exhibit 11)

75.   On or about June 22, 2023, John Sinnett reported to Tammie Knauer that the budget is at $162,696, and he has "$152,201.48 in funds available, I will need $10,494.52 to cover the ADA scope. I would highly recommend adding Alternate Two for $4,006. That gives us the ADA striping and now we have scope covered both interior and exterior. We're dangerously close to budget Tammie."  (Exhibit 12)

76.   Alternate Two is the swim door parking spaces restriping and curb cut-out. (Exhibit 13).

77.   On or about June 28, 2023, Kristen Battige, John Sinnett, Tammie Knauer, and Gardner Clute met with Becky Giacomelli regarding "Loveland HS – VCP Questions".

78.   On or about August 17, 2023 FCI Constructors updated Tammie Knauer and John Sinnett on "LHS OCR" which stated "Exterior concrete is complete in its entirety. Exterior striping and signage is scheduled for install 8/22". (Exhibit 14)

79. On or about September 5, 2023, Colorado Division of Fire and Prevention Control completed a final building inspection and issued a Certificate of Completion. (Exhibit 15).

80. There is no indication that ADA accessibility was inspected.

81. On or about September 22, 2023, John Sinnet emailed Kristen Battige, Tammie Knauer, and contacts from FCI Constructors and MOA Architects stating "I am pleased to announce we passed our inspection with flying colors. WELL DONE TEAM!!! There is one small thing they added I would like to ask if we can take care of please. At the door below, we need to add a sign on the exterior that says 'please use accessible entrance at main entry', with a 'left arrow". Advise when able." (Exhibit 16). See Figure C below.



*Fig. C- Main entrance depicted where Airlock is indicated. Red circle and exterior to interior doorway in front of the gym. The yellow box is to the left of the auditorium entrance. From Exhibit 16 by Plaintiff in her October 2023 CORA Request.*

### *Plaintiff Is A Qualified Individual*

82. Plaintiff is a qualified individual under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.S. §12131 et seq.

83. Plaintiff is permanently physically disabled due to lung disease and multiple neurological and autoimmune diseases.

84. Plaintiff is the natural parent of a student enrolled in Defendant School who was a freshman during the 2023-2024 school year.

85. Plaintiff, with or without reasonable modifications, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

86. At all relevant times, Plaintiff has been permanently physically disabled causing impaired mobility.

87. At all relevant times, Plaintiff has displayed a Persons With Disabilities Parking Placard.

88. Plaintiff submitted an application for a Disability Placard on May 24, 2023. As part of this application, Sarah Junker, M.D., a doctor holding Medical License DR0062969 and practicing medicine at Healing Arts Family Medicine at 3320 N Eisenhower Boulevard, Loveland, CO 80537, certified that Plaintiff was mobility impaired by reason of being "severely limited in [her] ability to walk due to an arthritic, neurological, or orthopedic condition". Dr. Junker signed the application which included the following statement:

> I certify, under penalty of perjury, that the above named patient has a physical impairment complying with 23 CFR 1235. I have read and understand Colorado Revised Statute 42-3-204 and 42-4-1208 as they pertain to certifying persons with disabilities and affirm my knowledge of

the contents of persons with disabilities notices and documentation made available to me pursuant to 42-3-204(3), C.R.S.

**Plaintiff Was Excluded from Participation In Or Denied the Benefits of A Public Entity's Services, Programs, or Activities**

*Parking*

89.     Until September of 2023, handicapped parking was designated in the school's main parking lot located on the west side of the school ("main lot"). See Figure D.



*Fig. D- Red box shows original ADA parking spaces. Red "x" shows main entrance.*

90.     On or about September 8, 2023, the School published a school newsletter with a section titled "Front of Building Handicap Parking Spots" which stated "All handicap parking spots have been removed from the West-Main Parking Lot and moved to the Southern "Swim" Parking Lot in order to meet ADA requirements. Please be aware of these changes when you are planning your visit at LHS." (Exhibit 17).

91.   From on or around September 8, 2023 until October 2023, handicapped parking was only available in the southern swim parking lot ("swim lot"). The swim lot was near a door which, at that time, could only be unlocked with a staff badge. The swim lot is approximately 600 feet from the main entrance. See Figure E.



*Fig. E- Red line shows path from the swim lot to the main entrance.*

92.   There is no sidewalk from the swim lot to the main lot, which is designated for car traffic, is significantly sloped, and is unlit. See Figure F.



*Fig. F- Slope from swim lot to access road.*

93.    There is no sidewalk access along the sloped access road, which accommodates two-way

vehicle traffic. See Figures G and H below.



*Fig. G- Access road from swim lot toward main lot.*



*Fig. H- Access road from the swim lot toward the main lot at dusk.*

94.     There is sidewalk along the main lot, but the wheelchair accessible ramp is at the far side of

the main lot when traveling from the swim lot.  See Figure B.

95.   In addition to the access road, the path from the swim lot to the front door requires the

disabled person to travel along a one-way "drop off" lane. See Figures I and J below.



*Fig. I. Photograph of drop off lane with sidewalk curb. Red arrow indicates wheelchair access.*



*Fig J. Close-up of wheelchair access at main entrance. Red arrow shows accessible route.*

96.    At or about 7pm on October 10, 2023 Plaintiff attempted to attend a school concert in the auditorium. Plaintiff and her husband parked in the ADA space in the swim lot. The swim door was locked and there was no way to request for it to be opened. Plaintiff attempted to access the main entrance which required Plaintiff to follow a narrow vehicle access road at a significant slope in the dark from the south side of the building to the west side. This required Plaintiff to traverse nearly the entire width of the west side of the building through the parking lot and through the prior ADA parking spaces to a raised curb to reach ramp access. Despite assistance from her husband, Plaintiff nearly fell on the curb due to the slope of the terrain at that location and determined that it was not safe for her to access LHS independently until ADA access was provided.

97. On or about October 18, 2023, Plaintiff called Loveland High School and spoke with Matt Blumenstein to ask how she would be able to access the school the evening of October 18, 2023 for the freshman family bootcamp and on the evening of October 19, 2023 for parent/teacher conferences. Plaintiff asked whether there is an entrance other than the main entrance that she could use and was told that the main entrance was the only entrance that would be unlocked for building access. Plaintiff was unable to attend the freshman family boot camp or conferences. (Exhibit 18)

98. On or about October 10, 2023 and October 11, 2023, Plaintiff tried to access the school via the main entrance from the swim lot.

99. On those two attempts, Plaintiff had assistance from her husband.

100. On or about October 6, 2023, October 18, 2023, and October 19, 2023, Plaintiff's husband was unable to assist her and so she was unable to attend four events (Hall of Fame, Freshman Family Boot Camp followed by Conferences, and Conferences).

101. At no time prior to October 20, 2023 was Plaintiff able to access the main entry independently from the swim lot.

### South "Swim" Door- Entrance

102. On or about October 20, 2023, Plaintiff contacted the operations department and was told to use the south swim door to access the building. (Exhibit 19). See Figure K.



*Fig. K- Red "x" indicates the location of the south swim door.*

103. On or about October 20, 2023, Plaintiff emailed John Sinnet, the Bond Manager, as well as Matt Blumenstein, Shawn Collins, Maria Gabriel, Dawn Kirk, and Dr. Marc Schaffer recounting the conversation of October 18, 2023 and informing the Defendant that she was unable to attend three events and that she had been told that only the main entrance could be used to access the building. Plaintiff asked how the swim door could be made accessible during events. (Exhibit 19)

104. On or about October 20, 2023, Tammie Knauer, the Bond Director, replied to Plaintiff's email and stated that "the changes were required by OCR to be code-compliant" and "from your summary after trying to use the new location – it seems we do not have all the logistics worked out that went with the change in location (the doors not working)" and "I have talked to the COO (Todd Piccone) and the director of Operations (Kristen Battige) regarding the issues today. We all agree that the situation needs further review and potential solutions to

the obstacles you presented. I wanted to let you know that we will spend time on this Monday to collaborate and identify improvements that can be made immediately to relieve the impacts you have voiced". (Exhibit 20)

105.   On or about Monday, October 30, 2023, Tammie Knauer received an email from Bryon Horgen, Defendant's Building Branch Unit Chief stating "as we discussed on the phone this morning, DFPC does not have any issue with creating "Limited Mobility Parking" stalls. As the slopes are too steep to meet accessibility requirements the signage cannot include the accessible symbol on them." (Exhibit 21)

106.   On or about Monday, October 30, 2023, Tammie Knauer received a letter, presumably incorrectly dated October 30, 2022, from Gardner Clute at MOA Architecture stating "MOA has reviewed the ICC A117.1 and the 2021 IBC. We do not see anything that would preclude the installation of limited mobility signs so long as the signage and striping do not in any way mimic the wording or look of the International Symbol of Accessibility (wheelchair symbol, usually blue and white) or conventional ADA signage. *Reserving spaces for individuals with limited mobility does not bring the west parking lot at LHS into ADA compliance."* (Exhibit 22) (emphasis added).

107.    On or about November 2, 2023, Todd Piccone emailed Plaintiff and stated "After reviewing options directly with the State of Colorado and our consultant, we have finalized the State-approved approach for providing alternate parking options at LHS. We will sign and paint two spots with a sign similar to this: https://www.myparkingsign.com/handicap-sign/parking-for-limited-mobility-sign/sku-k-5486".

108.   On or about November 2, 2023, Plaintiff emailed Dr. Marc Schaffer, Maria Gabriel, Dawn Kirk, and Alexandra Lessem and stated "I am forwarding Todd's 'solution': an offering of

2 limited mobility parking spaces in the west lot. That is all. Todd hasn't offered anything close to an ADA-accessible solution since I have asked for help on this matter in writing when I first emailed John two weeks ago. I have continued to be excluded from activities at LHS in the past two weeks. It has been a full 8 weeks since I have been continually denied safe and equitable access to my son's school, along with all disabled persons in our community including students themselves." She then quoted TSD nondiscrimination Policy AC which "reference a compliance officer" and requested the name and contact information so that she could file a Complaint. (Exhibit 23)

109.  On or about November 2, 2023, Dr. Marc Schaffer replied "Here is the contact information for our ADA Compliance staff member with the school district… Dorothy Barnhart (dorothy.barnhart@tsd.org). I will ask Dorothy to follow up with you directly, Joanna, so that she can address your questions as well as work with you to investigate this matter. Please be expecting an outreach." (Exhibit 23)

110.  To the date of this filing, Dorothy Barnhart has never contacted Plaintiff.

111.  Defendant's Staff Portal does not list Dorothy Barnhart as an ADA Compliance Officer. Instead, she is listed under the HR Department as a Benefits/Risk Manager who should be contacted for questions regarding benefits, pre-placement physical, public school works, safety, and student travel. [6]

112.  On or about November 2, 2023, Dr. Bill Siebers emailed Plaintiff and stated "My name is Bill Siebers responsible (sic) or Human Resources and Risk Management & Benefits." (Exhibit 23)

---

[6] "Who to Call". TSD Staff Portal. Thompson School District. https://staff.tsd.org/hr/who-to-call. Last accessed May 22, 2024.

113. On or about November 13, 2023 Dr. Bill Siebers stated "After reviewing policy AC-E-1, the two official compliance officers are Patti Virden, the Executive Director of Student Support Services, who is responsible for ADA specific to students and Tom Texeira, Director of Human Resources, who is responsible for ADA specific to employees, and Title IX and/pr federal and state civil rights laws for both students and employees." (Exhibit 23)

114. There is no indication that Defendant has a designated ADA Compliance Officer as Dr. Bill Siebers became the contact for Plaintiff.

115. On or about November 4, 2023 Plaintiff filed a Complaint with the Defendant. (Exhibit 24)

116. Along with the Complaint, Plaintiff provided videos and photographs to support her claims.

117. On or about November 17, 2023, Plaintiff emailed Bill Siebers and stated "No one has mentioned a word to me in nearly four weeks. Has it been decided that we are NOT using the south/swim lot for ADA parking? I haven't been able to get any clarity on this." (Exhibit 25)

118. On or about November 17, 2023, Bill Siebers replied "To answer your question, the south/swim lot has been available for ADA parking since the completion of the project in September 2023." (Exhibit 25)

119. On or about November 17, 2023, Plaintiff then replied "So to be clear, this would mean disabled persons would park in the south/swim lot, travel on the roadway to the main/west lot, and then enter the school at the main/west entrance". (Exhibit 25)

120. On or about November 28, 2023, Martin/Martin consulting engineers conducted a peer review of the accessibility features of the LHS site. (Exhibit 26)

121. On or about November 30, 2023, Bill Siebers emailed Plaintiff and stated "To give an immediate response and remedy, a push-button and camera will be installed by end of the

next Friday (12-8-23) to give the shortest accessible route to the building from the current south ADA accessible parking spaces." (Exhibit 26)

122.  On or around December 8, 2023, an ADA push plate and video call button were installed at an accessible surface height.



*Figure K- ADA push plate and video call button installed on or around December 8, 2023 at the south swim door.*

123.  On or about December 12, 2023, Defendant's Chief Human Resources Officer Bill Seibers provided an Investigation Written Report which found:

    1.  More likely than not, the parking spaces in the south parking lot of Loveland High School are accessible in compliance with the ADA and there are accessible routes and entry doors to the building from the south parking lot.

2. More likely than not when accessible parking spaces were installed in the south parking lot to replace spaces that were noncompliant in the west parking lot, an ADA push plate/camera at an accessible surface height was not installed at the door that is the closest point of access.

3. More likely than not, when the aggrieved individual attempted to access the entry door that was closest to the accessible south parking lot, the door was locked, thereby preventing entry.

4. More likely than not, although the access door closest to the accessible parking spaces in the south lot was locked, there were other accessible entries that the aggrieved individual could access from along an accessible route to enter the building.

5. Although the entry door closest to the accessible parking spaces in the south lot was locked, thereby preventing the aggrieved individual from entering the building at that location, there was another accessible entry along an accessible route for the aggrieved individual to enter the building.

6. Based on these findings, the building is compliant with legal requirements.

(Exhibit 27)

124. The Report "recommended the following corrective action to improve building accessibility from the south parking lot:

1. We recognize the inconvenience for the aggrieved individual and others seeking to access our facilities and so to address this concern and alleviate the inconvenience, the operations department should install an ADA push plate and camera at an accessible surface height at the entry door closest to the south parking lot by December 7, 2023, so that individuals with disabilities can more conveniently access the building through the south/swim parking lot."

(Exhibit 27)

125. Plaintiff immediately replied to the December 12, 2023 report by stating "to say I am extremely disappointed in this vague and nonspecific report is an understatement". She specifically refuted the findings in point 4 regarding other accessible entries and point 5 that there was an accessible travel route. She also noted that the report does not make a determination regarding responsibility per TSD policy AC-R or why the legal ADA upgrade

option presented in April 2023 was ignored. She also stated "I am unsatisfied with your determination and am therefore formally requesting a written review as indicated in policy AC-R". (Exhibit 28)

126. On the evening of December 12, 2023, Plaintiff attempted to attend her son's concert and was again unable to independently access the building. She videotaped her attempts.

127. On or about January 5, 2024, Plaintiff emailed Dr. Bill Siebers, Dr. Melissa Schneider, Dr. Marc Schaffer, and Dawn Kirk about the inaccessibility of the entry door. She stated:

Here are some of the ongoing ADA issues:

- no lighting at the swim lot door

- no signage at the swim lot door

- no one is on duty outside of school hours to answer the call button to unlock the door, so the swim lot door is always locked evenings and weekends, which is a common time for people to attend school events

(Exhibit 28)

128. Plaintiff also provided a video clip to Defendant which provided documentation of her attempts to access the building. The video also included clips of the locked double doors inside the swim door vestibule and the clutter along the hallway.

129. Defendant considered Plaintiff's objections as an appeal of Dr. Siebers' Report and Dr. Melissa Schneider, Chief Academic Officer, conducted a review of the matter.

130. On or about January 11, 2024, Dr. Schneider began her review which included reviewing the Report, videos, emails messages, and conducted site visits.

131. On or about February 3, 2024, Plaintiff attempted to access the building via the swim entrance and was unable to do so.

132.   On or about February 11, 2024, Dr. Schneider made her Final Determination and made the following findings:

1.   During the months and days prior to Ms. Johnson's complaint on October 20, 2023, the south swim lot entryway was not accessible to visitors during operational hours.

2.   During the months and days prior to the complaint dated October 20, 2023, the east parking lot and entry way was ADA-compliant and accessible to visitors.

3.   At the time of the incident, the aggrieved individual attempted to access the south swim lot entry door that was closest to the accessible south swim lot, the door was locked, thereby preventing entry.

4.   At the time of the incident, the aggrieved individual had followed instructions that were published in the school newsletter on September 8, 2023, which read "All handicap parking spots have been removed from the West-Main Parking Lot and moved to the Southern 'Swim' Parking lot in order to meet ADA requirements. Please be aware of these changes when you are planning your visit at LHS."

5.   The ADA parking spaces in the south swim lot of Loveland High School are accessible in compliance with the ADA, and there is one ADA-compliant accessible entry and route to the building via the south swim lot entry.

6.   The access route to the main entryway from the ADA-compliant parking spaces in the south swim lot is not ADA-compliant, thus proper signage indicates the south swim lot entryway as the access route from the ADA-compliant south swim lot spaces.

7.   There are several Limited Mobility parking spaces, providing close proximity to the main entrance doorway and additional space for parking, however, these spaces cannot be considered ADA-compliant due to the slope of the parking lot.

8.   In addition to the south swim lot entry, there are ADA-compliant parking spaces and an ADA-compliant accessibility route and doorway on the east side of the building with an ADA push plate/camera.

9.   An ADA push plate/camera at an accessible surface height was installed at the access doors for both the east and south swim lots approximately two weeks after the aggrieved individual attempted to access the building.

10.   During normal operating hours, either or both the south swim lot and east parking lot have ADA-accessible entryways that are monitored by staff who can assist with escorting the aggrieved individual to the building interior,

including opening the security double doors from the south swim lot. This also includes escorting the individual both with entry to and exit from the building.

11. As a standard operating procedure, all visitors are monitored upon their entry and exit of the building.

12. Visitors who desire access to the building outside of normal operating hours must make arrangements with a badged employee who will escort the individual both with entry into and exit out of the building.

13. Since the incident, the access route inside the building from the south swim lot entryway has been made clear and is in compliance with ADA requirements.

(Exhibit 29)

133. The Determination also noted that Dr. Siebers was wrong on several matters and noted "I have found that there is only one accessible route to the entry door to the building from the south swim lot. There are not multiple accessible routes. During the days and months prior to submitting the complaint, the aggrieved individual used the non-ADA compliant (and only) route to the main entryway from the south swim lot in order to access the building. She also "did not find there to be 'another accessible entry along an accessible route' from the south swim lot to the main entry, therefore there were not 'other accessible entries along an accessible route'". (Exhibit 29)

134. Plaintiff continued to attempt to access the building on April 18, 2024, April 19, 2024, April 25, 2024, May 1, 2024, and May 7, 2024 where the swim door was locked and the call button unanswered.

135. Dr. Schneider was incorrect on point 2. The east lot was not compliant. It was listed on the 2014 OCR monitoring spreadsheet. (Exhibit 30)

136. At the time of the 2014 OCR monitoring spreadsheet, there were no handicapped accessible parking spaces in the west lot. Plaintiff alleges that Defendant moved the handicapped spots from the east lot to the west lot to avoid addressing compliance issues with the east lot. This

would be a consistent pattern of behavior with Defendant moving the handicapped spots from the west lot to the south lot when ADA compliance was questioned.

137. Dr. Schneider was incorrect on point 3. There was not a single incident of inaccessibility. Plaintiff provided Dr. Schneider with a video and timeline of multiple accessibility issues in the January 5, 2024 email.

138. Dr. Schneider was incorrect on point 8. The east lot is not ADA compliant.

139. Dr. Schneider was incorrect on point 9. On September 8, 2023, Defendant published the newsletter informing the community that the parking spots were moved from the west lot to the south swim lot. Defendant's emails show that the push plate was not installed until December 7, 2023. This is three months where the ADA accessible parking spaces were closest to a non-accessible entrance.

140. Dr. Schneider admits that the south swim lot is the only area where the parking lot, parking spaces, and route to an entry are accessible. However, her assurance that "all visitors are monitored upon their entry and exit of the building" is incorrect. The swim entrance has never once been monitored after academic hours in any of the more than ten attempts that Plaintiff has made to access the building between October 10, 2023 and May 28, 2024.

141. The swim entrance is also unlit, which is not only in violation of the ADA, but also prohibits video monitoring at evening events. See Figure L.



*Figure L. The swim entrance, including video call button and camera, during an evening event.*

142. Dr. Schneider was incorrect on point 13. In the spring of 2024, the wrestling mats and ping pong tables were cleared from the area. However, Plaintiff continued to encounter furniture, athletic equipment, and other obstacles.

143. Despite providing notice of these issues, the Defendant only offered one accommodation to Plaintiff.

144. The Defendant notified Plaintiff that she needed to call the school ahead of time to arrange a badged escort from the parking lot through the swim entrance. (Exhibit 29)

145. At no time since October 20, 2023, when she was told to use the swim door, has Plaintiff ever been able to independently access the school via the swim door. When Plaintiff has attempted to access the school via the swim door, she has been unable to do so without the assistance of a friend or family member due to one or more barriers being present at every single attempt made: swim door being staff badge access only, swim door being locked and call button unanswered, equipment cluttering the hallways, interior push plate being locked, double fire doors being locked, and gates blocking the hallways. The Plaintiff required the assistance of family members, friends, and strangers to help her access the building.

146.  On each attempt, the swim door has always been locked, the video call button has always been unmonitored, and the push plate either was not installed or has never opened the door. On most attempts, Plaintiff's son would have to go through the main entrance, open the swim doors, and he and his Father would have to assist Plaintiff through the school.

147. The lack of ADA required access deprived Plaintiff of her right to participate equally with other parents in school programs in violation of her rights.

### South "Swim" Door- Exit

148. Furthermore, the ADA accessible swim doors prevented egress. The push plate installed by the district in December of 2023 was set so the mechanism was always locked and the district did not install any call button or communication system on the inside of the swim door to have the push plate unlocked.

149. At no time was there ADA egress out of the building at the swim door.

150. Plaintiff included video of the push plate not working in her January 2024 email.

151. At some point in March of 2024, the egress push plate became operable.

152.  The lack of ADA-required egress deprived Plaintiff of her right to participate equally with other parents in school programs in violation of her rights.

### Route from South "Swim" Door to Auditorium

153.  On or about January 5, 2024, Plaintiff emailed Dr. Bill Siebers, Dr. Melissa Schneider, and Dawn Kirk about the inaccessibility of the entryway.

154.  Plaintiff included written and video descriptions of the accessibility issues when the door was able to be opened by Plaintiff's friends or family.

155.  There are three corridors which could provide access to the auditorium from the swim door. See Figure M.



*Fig. M- The red "x" shows the "swim door". The orange "x" shows the main entrance. The green area depicts the swim hallway. The blue area depicts the athletic hallway. The yellow area depicts the auditorium hallway. Letters N through S correspond to the figures below.*

156.   The swim door opens into the swim hallway which serves as storage for athletic equipment, occasionally including ping pong tables. The swim hallway terminates in a second set of interior fire double doors. See Figure N.



*Figure N- Corridor from interior double doors looking towards exterior swim doors with ping pong tables and other equipment blocking hallway. Frame from video taken by Plaintiff on December 12, 2023 and provided to Defendant on January 5, 2024.*

157.   The interior double doors which are located between the swim hallway and the auditorium hallway are locked and require a badge to open. See Figure O.



*Fig. O- Right side of interior fire double doors with badge reader. Frame from video provided to Defendant on January 5, 2023.*

158.   Even when the double doors are propped open, the auditorium hallway on that side is often blocked. See Figure P.



*Fig. P- Right side of interior fire double doors open. Badge reader can be seen on right side of open door. Frame from video provided to Defendant on January 5, 2024.*

159. When the interior fire doors are blocked, the Plaintiff must turn right down the "athletic hallway".

160. The pathway down the athletic hallway from the swim doors to the auditorium is often blocked. See Figures Q and R.



*Fig. Q- Wrestling mats obstructing the athletic hallway. Frame from video provided to Defendant on January 5, 2024.*



*Fig. R- Hallway used as storage. Frame from video provided to Defendant on January 5, 2024.*

161. Even if the auditorium hallway was not blocked by the locked double doors or the chairs stacked behind the door, at times, the hallway was blocked at the other end, nearest to the auditorium entrance, by a metal gate. See Figure S.



*Fig. S– Gate obstructing hallway to double doors. Frame from video provided to Defendant on January 5, 2024.*

162. Even if the call button on the door was monitored and the push-plate was functional, the entry still presents significant accessibility issues. Despite having notice of the clutter issue set forth in Plaintiff's January email and the video from which Figures F through S were obtained being provided to Defendant, Defendant has not considered or offered a solution.

163. Defendant recognized that their push plate and call button "solution" did not work and instead required Plaintiff to arrange access via a badged escort who might, presumably, clear her path through the obstacle course.

164. The lack of ADA required access deprived Plaintiff of her right to participate equally with other parents in school programs in violation of her rights.

### Auditorium

165. The auditorium was required to be compliant with the 2010 ADA Standards.

166. Sections 221 and 802 of the 2010 ADA Standards apply to assembly areas, including auditoriums and concert halls.

167. School faculty and staff routinely placed a table and chairs within the designated handicapped seating area which interfered with Plaintiff's ability to use the handicapped seating area. See Figure T.



*Fig. T- Table, chair, and trash can placed in the handicapped seating area.*

168. Plaintiff has never observed this space without the table and chair as depicted in Figure T.

169. Plaintiff's child is involved in the music program. Prior to his enrollment in Loveland High School, he attended middle school enrichment programs and events at Loveland High School.

170. Plaintiff's child had events in the Loveland High School auditorium and Plaintiff was denied use of the handicapped seating area on or around July 15, 2021, October 11, 2021, February 24, 2022, April 26, 2022, October 12, 2022, November 9, 2022, February 28, 2023, April 25, 2023, May 9, 2023, February 3, 2024, February 27, 2024, March 4, 2024, and April 23, 2024.

171. The Loveland High School auditorium seats 589 people. (Exhibit 31)

172. In assembly areas for 500-5000 people, the minimum required number of wheelchair spaces is 6, plus 1 for each 150, or fraction thereof, between 501 through 5000. 2010 ADA Standards for Accessible Design (2010 ADA Standards), sections 221 and 802.

173. Loveland High School should then have 7 total wheelchair spaces.

174. Each wheelchair space should have a companion seat.

175. Loveland High School only has the 2 wheelchair spaces blocked by the table in Figure T.

176. The lack of required wheelchair seating and the improper use of the existing wheelchair and companion seating spaces resulted in Plaintiff's inability to participate equally with other parents in school programs in violation of her protected rights.

**Such Exclusion or Denial of Benefits or Discrimination Was By Reason of a Disability**

177. On two occasions, Plaintiff has been accompanied to an event taking place in the auditorium by her husband. On those occasions, Plaintiff was able to either be dropped off at the main entrance or park in the parallel parking spaces in the drop-off lane and access the main entrance.

178. On these occasions, Plaintiff was able to access the auditorium via a short traverse through an uncluttered hallway. Plaintiff observed that the main doors were unlocked and were able to be opened from both sides from the push-plate.

179. Upon information and belief, the main doors are kept unlocked during after-school activities and the main hallway and access kept clear to the auditorium.

180. Upon information and belief, no individual without a handicap is required to arrange for an escort into or throughout the building.

181. The activities that Plaintiff could not attend due to lack of access are:

October 6, 2023 Band Induction into LHS Hall of Fame

October 18, 2023 Freshman Family Boot Camp

October 18, 2023 IB Community meeting

October 18, 2023 Fall Conferences

October 19, 2023 Fall Conferences

October 27, 2023 School Play

November 1, 2023 PTSA meeting

November 2, 2023 Traditions Dinner for Band

November 13, 2023 SAC meeting

January 26, 2024 Stars of Honor Celebration

February 2, 2024 Stars of Honor Celebration

February 2, 2024 Band Camp Dinner

March 5, 2024 Spring Conferences

March 6, 2024 Spring Conferences

March 15, 2024 Pit Orchestra School Musical

March 26, 2024 Spring Orchestra Concert

April 18, 2024 Booster Club Meeting

April 19, 2024 Robotics Competition

April 25, 2024 Community Forum on Special Levy Ballot Measure

May 1, 2024 Show Reveal for LHS Performing Arts

May 7, 2024 Colorguard Marching Band Clinic

May 13, 2024 Band Awards Night

182.  The activities that Plaintiff did attend but was denied independent access and attended with

the assistance of 1-2 friends or family members:

October 10, 2023 Orchestra Concert

October 11, 2023 Sounds of the Stadium

November 30, 2023 Collage Concerts

December 2, 2023 Silent Auction Breakfast

December 5, 2023 Orchestra Concert

December 12, 2023 Sounds of the Season

February 3, 2024 Winter Ensemble Camp Concert

February 21, 2024 SAC meeting

February 27, 2024 Jazz Band Concert

March 4, 2024 Orchestra Concert

April 23, 2024 Show Reveal for Marching Band

May 9, 2024 Large Ensemble Band Concert

May 14, 2024 Orchestra Concert

## **DEFENDANT INTENTIONALLY DISCRIMINATED AGAINST PLAINTIFF**

183. Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.

184. Defendant has intentionally discriminated against Plaintiff because it is deliberately indifferent to the strong likelihood that a violation of Plaintiff's federally protected rights will result from its policy of requiring Plaintiff to arrange for an escort through the swim entrance rather than making the building accessible for Plaintiff to navigate independently.

185. Defendant has intentionally discriminated against Plaintiff because it is deliberately indifferent to the strong likelihood that a violation of Plaintiff's federally protected rights will result from its policy of requiring Plaintiff to arrange for an escort through the swim entrance instead of spending $182,307 to fix the main parking lot to allow Plaintiff to enjoy

equal access to the auditorium though a short, uncluttered route and unlocked door as other parents are able to do.

186. Defendant has intentionally discriminated against Plaintiff because it is deliberately indifferent to the strong likelihood that a violation of Plaintiff's federally protected rights will result from its policy of requiring Plaintiff to arrange for an escort through the swim entrance instead of spending $182,307 to fix the main parking lot to allow Plaintiff to enjoy equal access to the auditorium though a short, uncluttered route and unlocked door as other parents are able to do despite having $6.6 million in "decimal dust" to be spent on "contingency projects".

187. On or about October 20, 2023, the School District's Bond Project Manager John Sinnett admitted to Plaintiff that "We cannot get the main parking lot to qualify for ADA anymore because of *slopes.* There are several areas of the lot, drive isles, ramps, sidewalk, and island crossings that are too steep for the entire area including parts of the front pedestrian plaza and start over again. The cost is approaching a half million dollars and could only be done over a summer." (Exhibit 32) (emphasis added)

188. This email from the Bond Project Manager was a misrepresentation to Plaintiff because on or about March 9, 2023, Tammie Knauer confirmed that "For the ADA upgrades at LHS, I was directed to use General Fund Overperformance per Kristen/Facilities… The projected budget is $180k" (Exhibit 33). This projected budget included the parking lot issue along with other projects required by Defendant's Voluntary Compliance Plan.

189. However, Plaintiff's CORA request shows that the project could be completed, but the Defendant felt the cost of regrading and restriping the existing west lot was too high compared to restripe the swim lot and cutting away concrete to make a ramp in the curb.

190. CORA, OCR, RSD, and school board documents revealed that the operations department had a bid to upgrade the main lot to make it ADA accessible and funds to complete the project, but instead made a decision to shortcut the accessibility project by making the "swim door" plan, despite a warning from the architecture firm that their plans posed issues with ADA compliance.

191. On or about October 18, 2023, Dan Tran and Brendan Willits of the Citizen Bond Oversight Committee (CBOC) gave a presentation at the Defendant's District Board Meeting.

192. This presentation included a slideshow of how the 2018 Bond and additional funding was spent. Slide 7 is entitled "Summer Projects 2023" and includes "LHS- ADA upgrades underway". (Exhibit 34)

193. After discussing the required projects, Brendan Willits discusses the contingency projects to be completed with $6.6 million that was not spent on required projects, calling it "decimal dust".[7]

194. Instead of making the main entrance of the building ADA compliant, the Defendant earmarked $1.7 million to install AstroTurf on the softball and baseball fields at Loveland High School. (Exhibit 35)

195. Brendan Willits called this $1.7 million "decimal dust" after Defendant actively avoided spending $182,387 to make Loveland High School ADA Compliant.

196. In response to Plaintiff's complaints regarding accessibility, the Chief Operating Officer placed 2 "limited mobility" parking spaces in the main lot near the main entrance in November of 2023. (Exhibit 36)

---

[7] "Board of Education Meeting 10.18.2023." YouTube, uploaded by Thompson School District on October 18, 2023. https://youtu.be/F8sqghLyxDk?si=RfNLy3c5EuT5KB91&t=2818 at 57:00.

197. The COO contacted Plaintiff on November 2, 2023 and stated "After reviewing options directly with the State of Colorado and our consultant, we have finalized the State-approved approach for providing alternate parking options at LHS. We will sign and paint two spots with a sign similar to this: https://www.myparkingsign.com/handicap-sign/parking-for-limited-mobility-sign/sku-k-5486".  (Exhibit 36)

198. These parking spaces were two of the six parking spaces which had previously been marked as handicapped parking spaces but were determined to be ADA non-compliant.

199. Had the Defendant spent the money to re-grade the main lot, Plaintiff would have had access as depicted in Figure V.



*Fig. V- The green arrow depicts the path from the main entrance to the auditorium. The yellow arrow depicts the path from the swim entrance down the auditorium hallway to the auditorium, which is blocked by the interior fire double doors. The red arrow depicts the path from the swim entrance down the athletic hallway to the auditorium.*

200.   Plaintiff faced a choice of parking in the main lot where the "limited mobility" spaces were

not ADA-compliant and then risking injury due to the slope of the lot with an accessible

entry at the main entrance and no obstacles to the auditorium.

201. Plaintiff faced a choice of parking in the swim lot where the ADA-compliant parking spaces were and then using a badged escort to assist her past the ping pong tables and/or other athletic equipment, OR through the locked fire doors, past the chairs and equipment in the auditorium hallway, and through the metal accordion gate. On some occasions, her son was able to escort her through the locked access door if it was already propped open.

202. Plaintiff faced the choice of having her son, a friend, or a family member go through the main entrance and unlock the swim door from the inside and then escort her past the ping pong tables and equipment (Figure L), past the wrestling mats or other gym equipment (Figure O), and past the xylophones or other band equipment (Figure P).

203. Defendant was deliberately indifferent to Plaintiff when she presented these obstacles and difficulties associated with both gaining entry into the building from the swim lot and difficulties accessing the auditorium.

204. Defendant's deliberate indifference constituted intentional discrimination.

## CONCLUSION

205. Plaintiff is currently deterred from attending public events at Loveland High School because the school is inaccessible.

206. If Loveland High School was accessible, Plaintiff could attend events without assistance.

207. Plaintiff cannot meaningfully utilize the main, unlocked entrance for community events because the route from the handicapped parking to the main entrance is inaccessible. Each time Plaintiff attempted to attend an event using the accessible main entrance but the inaccessible route, she placed herself in physical danger because she had to navigate her wheelchair, knee scooter, or walking canes down the steep, unlit, narrow access road and down the length of the drop-off traffic lane which is at an inappropriate slope.

208. Plaintiff has attended her son's events and will continue to attend his events until his graduation in the spring of 2027.

209. Plaintiff seeks equal access to Loveland High School, of which an accessible parking spot, access route, door, hallways, and auditorium are integral components.

210. On numerous occasions, Plaintiff has faced difficulty entering Loveland High School as the result of inaccessible routes from the handicapped accessible swim lot to the handicapped accessible main entrance.

211. On numerous occasions, Plaintiff has faced difficulty entering the swim entrance due to an unmonitored video call button to unlock the door and an inoperable push-plate, in violation of 28 C.F.R. 35 133, which states: "Public accommodation shall maintain in operable working condition those features of faculties and equipment that are required to be readily accessible to and usable by persons with disabilities".

212. On numerous occasions, Plaintiff has faced difficulty viewing performances in the auditorium due to blocked wheelchair spaces.

213. Frustrated with the barriers she was encountering on a regular basis at Defendant's property, Plaintiff made a complaint on October 20, 2023.

214. Frustrated with the incorrect findings regarding her Complaint which were released on December 12, 2023 and continued barriers she encountered until that date, Plaintiff appealed the findings on January 5, 2024 and included a video of all issues.

215. On February 11, 2024, a final review was completed of Plaintiff's appeal.

216. The final accommodation offered to Plaintiff was for Plaintiff to contact the school to arrange for a badged employee to meet her at the swim entrance and escort her through the school.

217. The Defendant did not address the issues of the unworking push plate to exit the school for approximately three months and never addressed the cluttered hallways and blocked doors, or the blocked seating in the auditorium.

218. Plaintiff's request for accommodation was constructively denied by Defendant's failure to respond to those concerns.

219. Defendant failed to offer reasonable accommodation by fixing the slope of the main parking lot.

220. Defendant failed to offer reasonable accommodation by addressing the unmanned call button at the swim entrance, locked interior fire doors, and blocked hallways.

221. Defendant failed to offer reasonable accommodation by keeping the wheelchair seating in the auditorium usable.

## COUNT I- VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

222. The allegations of Paragraphs 1 through 221 of this Complaint are hereby realleged and incorporated by reference.

223. Defendant, Thompson R2-J School District, is a public entity subject to Title II of the ADA, 42 U.S. §12131(1).

224. Plaintiff is a person with a disability covered by Title II of the ADA, and she is qualified to participate in the Defendant's services, programs, and activities, including attending public events at Defendant's building.

225. Plaintiff was and is excluded from participation in Defendant's services, programs, and activities.

226. Plaintiff's exclusion was and is by reason of Plaintiff's disability.

227. Defendant discriminated against Plaintiff on the basis of disability by failing to provide full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations in violation of 42 U.S.CC. §12132.

228. Defendant discriminated against Plaintiff by keeping the "swim door" locked during public events.

229. "Public accommodation shall maintain in operable working condition those features of faculties and equipment that are required to be readily accessible to and usable by persons with disabilities" 28 C.F. R. 35 133.

230. The existence of a locked door with an unmonitored call button makes the door completely inaccessible and serves as a barrier which actively and continuously deters Plaintiff from attempting to utilize the swim entrance. Plaintiff has only been able to enter this door when a friend or family member goes through the main entrance and opens the swim door from the inside.

231. The push-plate to open the swim door from the interior side has also never been operable on Plaintiff's multiple attempts to exit the building.

232. The route from the swim door to the auditorium is inaccessible.

233. "Where a public entity must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets or potted plants. An isolated instance of placement of an object on an accessible route, however, would not be a violation, if the object is promptly removed. Similarly, accessible doors must be unlocked when the public entity is open for business". ADA Title II Tech. Assistance Man. II-3.0000

234. On numerous occasions, Plaintiff's access after entering the swim entrance was obstructed due to locked double doors at the end of the swim hallway. The doors do not open in response to activation of the push-plate, in violation of 28 C.F.R. 35 133.

235. The hallway from the swim door to the end of the swim hall is often blocked with ping pong tables and other athletic equipment.

236. The double doors, when open, are often blocked with chairs. The end of that hallway has a closed, metal gate.

237. When the double doors are locked, the Plaintiff must traverse the athletic hallway which is always blocked with athletic equipment.

238.  On multiple occasions, Plaintiff was unable to enter the building and had to return home.

239. On multiple occasions, Plaintiff had to have friends and family assist her with entering the building and navigating the hallways so that she could attend events in the auditorium.

240. On multiple occasions, Plaintiff remained home because no family or friend was able to assist her with entry to the building.

241. On multiple occasions, Plaintiff remained home because she was disillusioned by the lack of accessibility.

242. On multiple occasions, Plaintiff remained home because she lacks the physical strength to navigate either access route from the swim door to the auditorium.

243. On no occasion has Plaintiff been able to watch a performance in the auditorium from the wheelchair accessible seats. On every occasion, she was isolated to the entry hallway where she was unable to enjoy a performance with friends and family.

## **COUNT II- VIOLATION OF THE REHABILITATION ACT OF 1973**

244. The allegations of Paragraphs 1 through 243 of this Complaint are hereby realleged and incorporated by reference.

245. Section 504 of the Rehabilitation Act prohibits discrimination against persons with disabilities by any entity that receives federal financial assistance:

> no otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…

29 U.S.C. §784(a).

246. Defendant, Thompson R2-J School District, is a public entity receiving federal financial assistance.

247. Plaintiff is a person with a disability covered by Section 504 of the Rehabilitation Act, and she is qualified to participate in the Defendant's services, programs, and activities, including attending public events at Defendant's building.

248. Plaintiff was and is excluded from participation in Defendant's services, programs, and activities.

249. Plaintiff's exclusion was and is by reason of Plaintiff's disability.

250. Defendant discriminated against Plaintiff on the basis of disability by failing to provide full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations in violation of Section 504 of the Rehabilitation Act.

251. Defendant discriminated against Plaintiff by keeping the "swim door" locked during public events.

252. "Public accommodation shall maintain in operable working condition those features of faculties and equipment that are required to be readily accessible to and usable by persons with disabilities" 28 C.F. R. 35 133.

253. The existence of a locked door with an unmonitored call button makes the door completely inaccessible and serves as a barrier which actively and continuously deters Plaintiff from attempting to utilize the swim entrance. Plaintiff has only been able to enter this door when a friend or family member goes through the main entrance and opens the swim door from the inside.

254. The push-plate to open the swim door from the interior side has also never been operable on Plaintiff's multiple attempts to exit the building.

255. The route from the swim door to the auditorium is inaccessible.

256. "Where a public entity must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets or potted plants. An isolated instance of placement of an object on an accessible route, however, would not be a violation, if the object is promptly removed. Similarly, accessible doors must be unlocked when the public entity is open for business". ADA Title II Tech. Assistance Man. II-3.0000

257. On numerous occasions, Plaintiff's access after entering the swim entrance was obstructed due to locked double doors at the end of the swim hallway. The doors do not open in response to activation of the push-plate, in violation of 28 C.F.R. 35 133.

258. The hallway from the swim door to the end of the swim hall is often blocked with ping pong tables and other athletic equipment.

259. The double doors, when open, are often blocked with chairs. The end of that hallway has a closed, metal gate.

260. When the double doors are locked, the Plaintiff must traverse the athletic hallway which is always blocked with athletic equipment.

261.  On multiple occasions, Plaintiff was unable to enter the building and had to return home.

262. On multiple occasions, Plaintiff required friends and family assist her with entering the building and navigating the hallways so that she could attend events in the auditorium.

263. On multiple occasions, Plaintiff remained home because no family or friend was able to assist her with entry to the building.

264. On multiple occasions, Plaintiff remained home because she was disillusioned by the lack of accessibility.

265. On multiple occasions, Plaintiff remained home because she lacks the physical strength to navigate either access route from the swim door to the auditorium.

266. On no occasion has Plaintiff been able to watch a performance in the auditorium from the wheelchair accessible seats. On every occasion, she was isolated to the entry hallway where she was unable to enjoy a performance with friends and family.

267. At all times relevant to this action, Defendant conducted programs and activities with the receipt and assistance of federal financial aid and federal programs.

268. At all times relevant to this action, Loveland High School received federal funding.[8]

269. Defendant received $23,373,245 in federal funds for the fiscal year 2021-2022.[9]

270. Defendant has continued to receive federal funds for each subsequent fiscal year.

## DEMAND FOR JURY TRIAL

1. Plaintiff requests a trial by jury of all issues so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Joanna Johnson requests that the Court enter an ORDER that:

2. Grants judgment in favor of the Plaintiff and declares that Defendant's actions violate Title

---

[8] https://cde.state.co.us/schoolview/financialtransparency/organizations/1560/5316
[9] https://cde.state.co.us/schoolview/financialtransparency/organizations/1560

II of the ADA, 42 U.S.C. §§12131-12134, and its implementing regulation, 28 C.F.R. Part 35;

3. Enjoins Defendant and its agents and all persons acting in concert with Defendant from failing or refusing promptly to comply with the requirements of Title II of the ADA and its implementing regulations;

4. Grants judgment in favor of the Plaintiff and declares that Defendant's actions violate Section 504 of the Rehabilitation Act;

5. Enjoins Defendant and its agents and all persons acting in concert with Defendant from failing or refusing to promptly comply with the requirements of Section 504 of the Rehabilitation Act;

6. Appoints a Special Monitor to:

   A. Oversee the hiring, within 30 days, of an appropriate evaluator, preferably Meeting the Challenge, Inc. to perform an Accessibility Audit of Loveland High School, at the expense of the Defendant;

   B. Oversee that Defendant and its agents and all persons acting in concert with Defendant promptly develop a plan, within 30 days the result of the Accessibility Audit, to remedy the demonstrated violations of Title II of the ADA and its implementing regulations, and to fully and completely remedy the violations;

   C. Oversee Defendant's compliance with the ADA in performing any accessibility recommendations as identified by the Accessibility Audit, at the expense of the Defendant;

   D. Oversee the hiring, within 30 days, of an appropriate training facilitator, preferably Meeting the Challenge, Inc., to perform training for all Thompson School District administrators;

   E. Make periodic reports to the Court until Defendant is in compliance with the above Orders;

265. Enjoins Defendant from discontinuing Plaintiff's son's choice enrollment in LHS for retaliatory or any other reasons;

266. Orders Defendant to publish an apology in the school newsletter to Plaintiff and to all others affected by the Defendant's noncompliance at Loveland High School, and an apology specifically for the misrepresentations made by John Sinnet and Todd Piccone and for the "decimal dust" comment made by Brendan Willits;

267.  Orders attorneys' fees and costs as provided by 42 U.S.C. §12205;

268.  Orders attorneys' fees and costs as supported by *Mitchell v. City of Moore, Okla.*, 218 F.3d 190 (10th Cir. 2000), applying the rule in *Christiansburg Garment Co. v. Equal Employment Opportunity*, 434 U.S. 412, 98 S.Ct. 694 (1978); and

269.  Orders any other relief as the Court deems just and proper.

Respectfully submitted this 11th day of June, 2024.

/s/ Carissa Shipley
**Carissa Shipley**
Brain Injury Rights Group, Ltd.
Attorneys for Appellants
300 East 95th Street, Suite 130
New York, New York 10128
Telephone: (646) 850-5035
E-mail: carissa@pabilaw.org
Attorney for Plaintiff Joanna Johnson